IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TAMMARRA REANNE MOORE,<br><br>    Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | Civil Action No. 20-1550 |

ORDER

AND NOW, this 30th day of November 2021, upon consideration of Defendant's Motion for Summary Judgment (Doc. No. 17) filed in the above-captioned matter on June 28, 2021,

IT IS HEREBY ORDERED that the Motion is DENIED.

AND, further, upon consideration of Plaintiff's Motion for Summary Judgment (Doc. No. 15) filed in the above-captioned matter on May 27, 2021,

IT IS HEREBY ORDERED that Plaintiff's Motion is GRANTED and the matter is remanded to the Commissioner of Social Security ("Commissioner") for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

I.  **Background**

In 2015, Plaintiff applied for disability insurance benefits and supplemental security income pursuant to Titles II and XVI of the Social Security Act ("Act"). (R. 174). When her applications were denied, she sought a hearing before an Administrative Law Judge ("ALJ"), but the ALJ found Plaintiff not disabled. (R. 187). Plaintiff challenged that decision, the Appeals Council remanded the matter, and on October 30, 2019, Plaintiff appeared before another ALJ, Paul Kovac, for her second hearing. (R. 19). He likewise found Plaintiff not disabled. (R. 33). Plaintiff asked the Appeals Council to review ALJ Kovac's decision, but the Council declined

(R. 1), making his decision the final agency decision. 20 C.F.R. §§ 404.981, 416.1481. Plaintiff sought the Court's review and her and the Commissioner's summary judgment motions are now before the Court.

**II.     Standard of Review**

The Court reviews the Commissioner's findings of fact for substantial evidence and has plenary review as to all legal questions. *Hansford v. Astrue*, 805 F. Supp. 2d 140, 143 (W.D. Pa. 2011) (citing 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994); *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 431 (3d Cir. 1999)). The substantial evidence standard is deferential, and the Court may not set the Commissioner's decision aside merely because it would have arrived at a different conclusion. *Id.* (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)). So long as the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," the decision stands. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted).

ALJs employ a "familiar five-step analysis" to determine disability. *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 201 (3d Cir. 2019) (citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2016)). At the first step, the ALJ ensures the claimant is not performing "substantial gainful activity" ("SGA"). *Id.* (citation omitted). At the second step, the ALJ identifies the claimant's severe, medically determinable impairments. *Id.* (citation omitted). The claimant must suffer from at least one such impairment for the analysis to continue. *Id.* If the analysis does continue, the ALJ asks at step three whether the claimant's impairments—individually or combined—meet criteria for certain presumptively disabling impairments that are listed in the regulations. *Id.* (citations omitted). If not, the evaluation continues and the ALJ must determine the claimant's residual functional capacity ("RFC") to determine whether it permits the claimant's return to

"past relevant work." *Id.* (citation omitted).  If the claimant cannot return to his or her past relevant work, the ALJ moves to the fifth and final step where he asks whether the claimant's RFC, age, education, and work experience permit adjustment to other work.  *Id.* at 202 (citation omitted).  At this final step, the burden is on the Commissioner to "provid[e] evidence that demonstrates that other work exists in significant numbers in the national economy" that the claimant can do given his or her RFC and vocational characteristics.  20 C.F.R. § 404.1560(c)(2).

### III. The ALJ's Decision

In this matter, the ALJ found Plaintiff had not engaged in SGA since the alleged onset date and further found that she suffered from five severe, medically determinable impairments.[1]  (R. 22).  The ALJ determined that, though severe, these impairments were not presumptively disabling either individually or in combination (R. 22), moved on to consider the evidence in the record to formulate Plaintiff's RFC (R. 25—30), and found she could sustain a reduced range of light work.  (R. 24).  The ALJ articulated various limitations for Plaintiff's light-work RFC, such as limiting her standing to just four hours daily, walking to two hours daily, and specifying that she would require the option to stand for five minutes after twenty-five minutes of sitting, and to sit for five minutes after twenty-five minutes of standing and walking.  (R. 24).  The ALJ also directed that Plaintiff could only manage occasional interaction with others and excluded from her abilities any tandem or group tasks.  (R. 25).  Finally, the ALJ limited Plaintiff to low stress environments free from paced work, the demand of keeping up with a machine, or more than occasional changes in the "routine work setting."  (R. 25).

---

[1] The ALJ identified Plaintiff's severe, medically determinable impairments as rheumatoid arthritis, left hip bursitis, rotator cuff impingement syndrome, depression, and anxiety.  (R. 22).

3

Based on this RFC, the ALJ determined Plaintiff could not return to past work, so he proceeded to the fifth and final inquiry of the five-step evaluation: whether Plaintiff's RFC and vocational characteristics would permit adjustment to other work. (R. 30). He enlisted the assistance of vocational expert, Ms. Kopar, to make this finding. (R. 30—31). Presented with all of Plaintiff's limitations, Ms. Kopar identified four appropriate occupations—addresser, photocopy operator, order caller, and marker—and opined that there were approximately 65,000 such jobs in the national economy. (R. 31—33, 94—96).[2] Ms. Kopar also testified to the appropriateness of the "surveillance systems monitor" occupation, but the ALJ did not rely on her testimony to that effect in his decision. (R. 32). Ms. Kopar indicated that her testimony was consistent with the Dictionary of Occupational Titles ("DOT") except where particularities of Plaintiff's RFC were not addressed in the DOT, *e.g.*, sit/stand options. (R. 32, 96).

At the hearing, Plaintiff asserted a right to file post-hearing evidence to rebut Ms. Kopar's testimony. (R. 81). The ALJ did not agree Plaintiff was entitled to a post-hearing submission of rebuttal evidence, but he agreed to hold the record open. (R. 81—82, 97). To that end, Plaintiff filed her vocational expert's report, which appears in the record at Exhibit 20E ("Heckman Report"). (R. 480—84). In the report, Mr. Heckman presented an occupation-by-occupation critique of Ms. Kopar's testimony. He was particularly critical of Ms. Kopar's reliance on the DOT, which he described as a substantially outdated and therefore unreliable source of job information.[3]

---

[2] The transcript records that Ms. Kopar testified there were 100,000 marker jobs (R. 96), while the ALJ described Ms. Kopar as testifying there were 10,000. (R. 32). This discrepancy is noted but has no effect on the Court's consideration of the issues presented by the parties.

[3] Mr. Heckman indicated that he "respectfully disagree[d] across the board with [Ms. Kopar's] testimony." (R. 480). He explained that though Ms. Kopar found the occasional-interaction limitation in Plaintiff's RFC was compatible with the occupations identified, that

---

limitation would actually render a claimant totally "unemployable" because of the interpersonal demands of "training and probationary" periods. Mr. Heckman based this opinion on his professional experience. (R. 480—81).

Setting that aside, Mr. Heckman countered the rest of Ms. Kopar's testimony on other grounds. Concerning Ms. Kopar's reliance on the DOT, Mr. Heckman countered that the Department of Labor had abandoned the DOT for job categorization in favor of the standard occupational classification system ("SOC"). (R. 481). He indicated that where the non-physical aspects of job descriptions were concerned, *e.g.*, "technology skills, general knowledge, general abilities," he favored the Occupational Information Network ("O*Net"). (R. 481). He described the O*Net, being "constantly" updated, as "extremely valuable for evaluating certain aspects of jobs in comparison to the DOT" with its decades-old jobs descriptions. (R. 481).

Using the O*Net, Mr. Heckman explained why the jobs Ms. Kopar identified likely no longer existed as they were conceived in the DOT and that, to the extent they existed, they were very few in number. First, Mr. Heckman explained that surveillance system monitor jobs were no longer unskilled. (R. 481—82). Next, he questioned the continued existence of stand-alone addresser jobs and pointed out that the DOT described the job to include antiquated methods like addressing mailings by hand or typewriter. (R. 482). He opined that insofar as "addresser" was not an obsolete occupation, many jobs would be part-time, require significant contact with others, demand adherence to deadlines, or call for skills like using office suite software. (R. 482). Ultimately, Mr. Heckman believed "far less than 1000 [addresser] jobs" existed in the national economy. (R. 482).

Turning to photocopy machine operator, Mr. Heckman opined that since the DOT was last updated, this job had become a semi-skilled or skilled position and, further, that in many instances it likely requires "constant contact with others." (R. 482—83). He estimated that "less than 1000 total jobs" in the occupation remained. (R. 483). For the "order caller" job, Mr. Heckman pointed out that DOT description was "very antiquated and quite outdated" (R. 483) and that the O*Net job description imagined some level of skill, such as "integration of technologies." (R. 483). Based on the skill required, Mr. Heckman opined that the "number of available [order caller] jobs" had been reduced to zero. (R. 483). Even setting aside the skill issue, Mr. Heckman believed that many of these jobs were part time or required other abilities beyond what the ALJ included in the operative hypothetical, such that the number of jobs would be "far less than 1000." (R. 483).

For the marker job, Mr. Heckman found similar problems based on his experience and the O*Net's more up-to-date descriptions. Mr. Heckman determined that the "combined effect of all the reductions . . . reduce[d] the number of available jobs to a person limited as described in the hypothetical, to far less than 1000, and possibly even zero." (R. 484). In an accompanying footnote, Mr. Heckman noted that he believed a "case can be made that the job of Marker no longer exists as described in the DOT since last updated in 1977." (R. 484).

5

The ALJ considered both Ms. Kopar's testimony and the Heckman Report at step five. (R. 31—33). Considering Mr. Heckman's opinion that the occasional-interaction limitation would preclude all work, the ALJ rejected it. (R. 32). He explained that Mr. Heckman's opinion in that regard was only based on professional experience, whereas Ms. Kopar had confirmed that her testimony was consistent with the DOT. (R. 32). The ALJ also rejected Mr. Heckman's occupation-by-occupation critique of Ms. Kopar's testimony, explaining:

> Mr. Heckman's opinion is inconsistent with Ms. Kopar's opinion, which, as established above, is consistent with the DOT. Thus, Mr. Heckman's opinion as to the number of positions available in the national economy for the four positions listed above is equivocal and is against the weight of the evidence. Based on the testimony of Ms. Kopar and the information contained within the DOT, the undersigned concludes that . . . the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.

(R. 32—33).[4]

In the alternative, the ALJ appeared to posit that even if he had favored Mr. Heckman's opinion, he would have decided step five in the Commissioner's favor because Mr. Heckman opined there might be as many as several thousand jobs suited to Plaintiff's RFC and vocational characteristics. (R. 32—33). He explained that though Mr. Heckman indicated possibly zero jobs existed for Plaintiff, he also indicated that there were as many as "fewer than 1,000" jobs per occupation, and that the difference between those two estimates was "not irrelevant." (R.

---

[4]    Mr. Heckman, not yet knowing the ALJ would decline to include the surveillance system monitor job on the list of representative occupations for Plaintiff in the decision, offered a critique of Ms. Kopar's surveillance system monitor testimony too. (R. 481). The ALJ rejected that part of the Heckman Report as "moot." (R. 32).

6

32).[5]  Having explained his consideration and rejection of the Heckman Report in favor of Ms. Kopar's testimony, the ALJ found Plaintiff could adjust to other work and, therefore, was not disabled.  (R. 33).

IV.     Legal Analysis

Plaintiff raises two main challenges to the ALJ's decision.  First, she argues that the ALJ's explanation for rejecting the Heckman Report in favor of Ms. Kopar's testimony is insufficient to permit meaningful review, and that therefore the decision is not supported by substantial evidence.  She also argues that the ALJ's RFC finding is not supported by substantial evidence because the ALJ failed to appropriately consider the medical opinion evidence, especially the medical opinion from Plaintiff's treating rheumatologist.  Though the ALJ's consideration of the medical opinion evidence was adequate,[6] the ALJ's consideration of the

---

[5]    The ALJ explained that courts have found as few as 200 jobs in the national economy or 1,350 jobs in a claimant's locality "significant." (R. 32—33 (citing *Craigie v. Bowen*, 835 F.2d 56 (3d Cir. 1987); *Hall v. Bowen*, 837 F.2d 272 (6th Cir. 1988)).  The Court notes that the ALJ's description of the *Craigie* decision is slightly inaccurate.  Though the ALJ cited *Craigie* as a case where 200 jobs nationally constituted an adequate number (R. 33), the United States Court of Appeals for the Third Circuit determined in that matter that "about 200 jobs in the light exertional category within [the claimant's] capabilities in his *region*" provided a "clear indication that there exists in the national economy other substantial gainful work which [he] can perform." 835 F.2d at 58 (emphasis added).

[6]    Because Plaintiff filed her applications before March 27, 2017, the ALJ's consideration of the medical opinion evidence was governed by the regulations at 20 C.F.R. §§ 404.1527, 416.927.  The regulations direct that treating-source medical opinions are usually afforded special weight, even "controlling weight" if they are well-supported and consistent with other substantial evidence.  *Id.*  If the ALJ decides not to afford a treating source's opinion controlling weight, he is directed to consider the factors at sections 404.1527(c), 416.927(c).  In the decision, the ALJ must adequately articulate his "supporting explanations" for affording a treating source's opinion less than great weight.  *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008) (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)).

Here, Plaintiff's treating rheumatologist, Dr. Sharma, offered his opinion concerning Plaintiff's limitations, but the ALJ afforded the opinion only "partial weight."  (R. 29).  Dr. Sharma opined on a "MEDICAL SOURCE STATEMENT" form that Plaintiff could sit for eight

Heckman Report was too conclusory and speculative for this Court to find the decision is supported by substantial evidence. Accordingly, the Court will order remand for the ALJ to

---

hours and stand/walk four hours daily. (R. 823). Dr. Sharma commented on Plaintiff's ability to lift, carry, and handle, and further indicated how Plaintiff's impairments would affect her concentration. (R. 823). He also made a prediction as to how frequently Plaintiff would require breaks and absences. (R. 823). The ALJ found Dr. Sharma's standing/walking/sitting opinions were generally "supported by the evidence," and indicated that he crafted the RFC to accommodate those limitations by, for instance, including a sit/stand option. (R. 29). However, the ALJ was unconvinced that Plaintiff's lifting, carrying, and handling limitations were as significant as Dr. Sharma indicated them to be because Plaintiff had experienced "significant improvement with the treatment such that she typically demonstrated no synovitis or dactylitis and full 5/5 grip strength and full range of motion of her wrists." (R. 29). To that end, the ALJ cited Dr. Sharma's treatment notes. (R. 29 (citing R. 865, 889, 911, 936, 981)). The ALJ also found Dr. Sharma's opinion concerning breaks and absences to be inconsistent with Plaintiff's activities. (R. 30).

Plaintiff argues that this assessment is inadequate because the ALJ failed to expressly reference the factors at sections 404.1527(c), 416.927(c), *e.g.*, the nature and extent of the treating relationship, supportability, and consistency. However, it is clear from the decision, read as a whole, that the ALJ considered Plaintiff's treating history with Dr. Sharma including its length, Dr. Sharma's specialty, and the degree to which other evidence in the record supported Dr. Sharma's opinion. And while explicit mention of the relevant factors might have aided this Court's review, ALJs are not required to use any "particular language" or "format" where their decisions demonstrate consideration of the "appropriate factors" and permit "meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 504—05 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119—20 (3d Cir. 2000)) (explaining—in the context of a step-three listed impairments inquiry—that the substantial evidence inquiry is an examination of substance, not form). Accordingly, the Court is satisfied by the ALJ's consideration of Dr. Sharma's opinion.

To the extent other medical opinion evidence—specifically, Dr. Van Tran and Dr. Rabinovich's opinions—were consistent with Dr. Sharma's opinion, the ALJ adequately explained why he afforded those opinions "little weight." (R. 29—30). For example, he noted that both Dr. Van Tran and Dr. Rabinovich had considered Plaintiff's condition *before* she had started treatment with a rheumatologist. (R. 29—30). Having considered the opinion evidence together with Plaintiff's testimony, medical records, and her friend and family's testimony, the ALJ articulated Plaintiff's RFC, as was appropriate. *Cummings v. Colvin*, 129 F. Supp. 3d 209, 217 (W.D. Pa. 2015) (citing 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)) ("The assessment must be based upon all of the relevant evidence, including the medical records, medical source opinions, and the individual's subjective allegations and description of his own limitations."). The ALJ was not required to premise the RFC finding on "an opinion from a medical source." *Id.*

further consider and explain his resolution of the conflicting job-availability evidence in the record.[7]

ALJs must address and resolve conflicting probative evidence in the record. *See Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (directing ALJs to resolve conflicting medical opinion evidence); *Whitmire v. Comm'r of Soc. Sec.*, No. 3:13-CV-1380, 2014 WL 582781, at *3 (M.D. Pa. Feb. 14, 2014) (citing *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993)). Further, ALJs may not reject evidence "for no reason or for the wrong reason." *Cotter*, 642 F.2d at 706 (citing *King v. Califano*, 615 F.2d 1018 (4th Cir. 1980)). If the ALJ fails in one of these respects—neglects to resolve a conflict of evidence, rejects probative evidence for no reason, or rejects it for the wrong reason—the reviewing court may not salvage the decision by substituting its own "independent analysis" for the ALJ's flawed rationale. *Fargnoli v. Massanari*, 247 F.3d 34, 44 n.7 (3d Cir. 2001) (citing *SEC v. Chenery Corporation*, 318 U.S. 80, 87 (1943)).

---

[7] Before the ALJ and in the brief filed in support of her summary judgment motion, Plaintiff has described the opportunity to present evidence rebutting vocational expert testimony as an entitlement. (R. 80—82, Doc. No. 16, pgs. 3—4). Her argument is premised primarily on a position taken by the Commissioner in *Biestek v. Berryhill*, 139 S. Ct. 1148 (2019), and a footnote in Social Security Ruling 96-9p, which instructs ALJs in their consideration of claimants who are capable of less than a full range of sedentary work. 1996 WL 374185, at *9 n.8 (July 2, 1996) ("Whenever a [vocational expert] is used, the [claimant] has the right to review and respond to the [vocational expert] evidence prior to the issuance of a decision."). Courts diverge as to whether the opportunity to present post-hearing rebuttal evidence is an entitlement. *Compare Tonti v. Saul*, No. CV 20-92, 2021 WL 518178 (W.D. Pa. Feb. 11, 2021), *with Allen v. Comm'r of Soc. Sec.*, 475 F. Supp. 3d 413 (M.D. Pa. 2020).

Because the ALJ specifically agreed to hold the record open for Plaintiff to submit her rebuttal evidence, the Court need not weigh in on the issue of whether the ALJ was required to afford her the opportunity to do so. *Cf. Tonti*, 2021 WL 518178, at *3 ("Here, Tonti neither objected to the VE's testimony at the hearing nor obtained any agreement from the ALJ either prior to the hearing to hold the proceedings open for post-hearing submissions."). Once the Heckman Report became part of the record, the ALJ was required to consider it along with all the "relevant, probative and available evidence." *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979). *See Plummer*, 186 F.3d at 433.

In this case, the conflicting job availability evidence in the record was relevant to the final step of the disability determination. As explained above, the evidentiary burden shifts at this step from the claimant to the Commissioner who must show "that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform." *Whitmire*, 2014 WL 582781, at *2 (citing *Mason*, 994 F.2d at 1064); 20 C.F.R. § 404.1560(c)(1) ("[W]e are responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that you can do, given your residual functional capacity and vocational factors."). To make a finding at step five, ALJs take "administrative notice of reliable job information available from various governmental and other publications." 20 C.F.R. § 404.1566(d). The regulations identify several examples of sources of reliable job information, including the DOT which is a Department of Labor publication. *Id.* § 404.1566(d)(1)—(5).

ALJs may also call in a vocational expert to determine whether a claimant's "work skills can be used in other work and the specific occupations in which they can be used." *Id.* § 404.1566(e). Vocational experts help the ALJ determine not only which jobs have requirements that are compatible with the claimant's abilities, but also help ALJs assess the availability of those jobs, that is, whether they exist in sufficient number or only "very limited numbers in relatively few locations outside of the region where [the claimant] live[s]." *Id.* § 404.1566(b). The way ALJs draw upon vocational experts' knowledge is usually through a series of hypothetical questions that reflect the claimant's abilities and vocational characteristics. *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984).

When vocational experts testify, ALJs are compelled to ask them whether their testimony is consistent with the DOT. SSR 00–4p, 2000 WL 1898704, at *2 (Dec. 4, 2000). Failure in this

regard can sometimes require remand. *Zirnsak v. Colvin*, 777 F.3d 607, 617 (3d Cir. 2014) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 557 (3d Cir. 2005)). The procedure outlined in SSR 00-4p reflects the DOT's undeniable significance in disability determinations. However, it also demonstrates that the DOT is not unassailable. *See* SSR 00-4P, 2000 WL 1898704, at *2 ("Neither the DOT nor the VE or VS evidence automatically 'trumps' when there is a conflict."). Looking to the regulations, it is clear that ALJs' lodestar is "reliable job information" found in "various governmental and other publications," of which the DOT is an example. 20 C.F.R. § 404.1566(d). Accordingly, when a claimant challenges the reliability of job information from or premised upon the DOT, the DOT's special significance may not be cited as the lone basis for rejecting the claimant's contrary evidence.

      That is where the agency's decision fell short in this matter. Plaintiff not only questioned whether the DOT could be relied upon to accurately assess her job prospects, but presented counter evidence suggesting that the DOT's information concerning the jobs identified for her was outdated. Making that argument, Plaintiff joined many claimants who have questioned the DOT's reliability when, in the time since its last update (1991), work methodologies have changed drastically. *See e.g.*, *Whitmire*, 2014 WL 582781, at *9—10 (reviewing cases).[8] In *Sams v. Berryhill*, the United States District Court for the Northern District of Florida considered that even the testifying vocational expert conceded the DOT was "old." No. 1:17CV15-CAS, 2017 WL 3974239, at *1—2 (N.D. Fla. Sept. 8, 2017). The claimant there objected to the vocational expert's reliance on the DOT despite its age and filed post-hearing objections wherein

---

[8]     In *Whitmire*, the court rejected the claimant's challenge to the DOT largely because the claimant had not presented competing O*Net job descriptions to the ALJ and there was no indication from the Commissioner whether the O*Net ought to be considered a reliable resource. *Id.* at *10.

he argued the O*Net should have been used instead. *Id.* at *2. The court held that while the DOT is an approved source and vocational experts are under no obligation to base their opinions on O*Net, the ALJ erred in failing to rule on the claimant's objections where the reliability of the expert's DOT-based testimony was "shown to be questionable." *Id.* at *8.

Similarly, in *Allen v. Commissioner of Social Security*, the United States District Court for the Middle District of Pennsylvania found the ALJ erred in failing to address Allen's objection to the vocational expert's testimony. 475 F. Supp. 3d 413, 421 (M.D. Pa. 2020). In *Allen*, the vocational expert relied on the DOT despite Allen's objection that the DOT was outdated and unreliable. *Id.* at 419. The court's decision reflects the DOT's special—but not inviolable—status in the Social Security regulations and rulings. The court aptly explained that the alleged error might have been harmless were an expert's "reliance on the DOT . . . categorically permitted, thus rendering any opposition to such reliance meaningless." *Id.* at 421. But because that was not the case, the ALJ erred in failing to address Allen's substantive concerns about the "reliability of the DOT job descriptions." *Id.* at 421—22. *Allen* is particularly instructive here where Plaintiff, like Allen, did not ask the ALJ "to abandon the DOT for O*Net," *id.*, but rather relied on the O*Net to support her argument that the DOT's descriptions of the occupations Ms. Kopar identified for an individual with her RFC and vocational characteristics were unreliable.

Plaintiff has refrained from asking the Court to elevate the O*Net over the DOT. Rather, she is contesting as insufficient the ALJ's explanation for choosing Ms. Kopar's testimony over Mr. Heckman's report solely because the former was consistent with the DOT. The Court agrees that the ALJ erred in premising his preference for Ms. Kopar's testimony on the DOT alone for the same reasons the court in *Allen* found categorical reliance on the DOT was inappropriate.

Were the DOT entitled to an irrebuttable presumption of reliability, the ALJ's explanation of his preference for Ms. Kopar's testimony, though brief, would likely provide the "accurate and logical bridge"[9] between the evidence in the record and the ALJ's decision that courts require. However, the Court finds so strong a presumption is unjustified. Because of the ALJ's error, remand is the appropriate course. *Cotter*, 642 F.2d at 706 (explaining that remand is appropriate where an ALJ rejects evidence for the "wrong" reason").

To the extent the error might have been rendered harmless by the ALJ's observation that even Mr. Heckman's numbers satisfied the Commissioner's burden to show jobs were available in sufficient number at step five, the Court finds that secondary rationale too speculative to support the decision. It is the case that there is no specific minimum number of jobs that may constitute a "significant number" of jobs at step five of the evaluation. *Young v. Astrue*, 519 F. App'x 769, 772 (3d Cir. 2013) (finding 20,000 jobs in the national economy constituted a "significant number"). And, as the Commissioner points out, as few as 200 jobs in a claimant's region/locality have been found sufficient. *Craigie*, 835 F.2d at 58.

According to Mr. Heckman, there may have been as few as zero or perhaps as many as 3,996 jobs in the national economy for an individual with Plaintiff's abilities and vocational characteristics. (R. 480—84). And before he rejected Mr. Heckman's opinion on the number of jobs that were available to Plaintiff in the national economy, the ALJ found Mr. Heckman's opined range of zero to several thousand jobs "not irrelevant," suggesting his step-five determination might have been the same had he based it on Mr. Heckman's numbers. (R. 32, 33). However, for that observation to serve as an alternative rationale, the ALJ had to make a speculative jump to his conclusion: zero jobs clearly could not constitute a significant number, so

---

[9]   *Gamret v. Colvin*, 994 F. Supp. 2d 695, 698 (W.D. Pa. 2014).

the ALJ would have had to speculate that, if pressed, Mr. Heckman would not have identified a more precise estimate close to the bottom of the range he provided initially. The Court is not satisfied that such a speculative inference constitutes substantial evidence. *See Biestek*, 139 S. Ct. at 1159 (Gorsuch, J., dissenting) (citing *Cao He Lin v. U.S. Dep't of Justice*, 428 F.3d 391, 400 (2d Cir. 2005)) ("Speculation isn't substantial evidence.").

With this order, the Court does not intend to broadly disparage the DOT's reliability. Nor should this order be construed to require that the ALJ perform an independent review of the DOT and O*Net to determine, as a general matter, which provides more reliable job information. Pursuant to the regulations, the DOT is presumed to be a source of reliable job information in the absence of evidence to the contrary.[10] However, when there is competing job information in the record that purports to be more reliable than job information that is drawn from or consistent with the DOT, the ALJ may not summarily favor the latter *solely because* it is consistent with the DOT. Were the Court to decide otherwise, it would be recognizing a presumption of reliability for the DOT beyond what the regulations support.

V. **Conclusion**

Based on the foregoing, the Court has determined that remand is appropriate for further consideration of Plaintiff's applications for benefits under the Act. On remand, any objections to

---

[10] Accordingly, it will often continue to be entirely appropriate for an ALJ to rely on a VE's testimony based on its consistency with the information in the DOT. Here, for instance, there was no error in the ALJ's decision to credit Ms. Kopar's testimony over Mr. Heckman's opinion that an occasional-interaction limitation would preclude all work because for that opinion, specifically, Mr. Heckman had not relied on the O*Net nor on any other "specific authority." (R. 32). Instead, he relied on his "professional experience" alone. (R. 32). Ms. Kopar—also an expert in the field—testified that the occasional-interaction limitation would not be work preclusive and further testified that all her testimony was consistent with the DOT. (R. 32). Here, the ALJ explained that DOT-consistency was, essentially, a tiebreaker between the two experts' opinions, and the Court finds that explanation adequate.

job availability evidence in the record should be addressed "in narrative fashion" that would permit meaningful review.  *Sams*, 2017 WL 3974239, at *8.  Accordingly, the Court remands this matter to the Commissioner for further consideration consistent with this Order.

<u>s/ Alan N. Bloch</u>  
United States District Judge

ecf:   Counsel of Record